UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BRANDON SAMIR BAZZI,

                Petitioner,                      Case No. 1:10-cv-799

v.                                        Honorable Paul L. Maloney

KENNETH McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a bench trial in the Wayne County Circuit Court, Petitioner was found guilty of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, and possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b. On August 30, 2007, Petitioner was sentenced to a prison term of five to fifteen years on the assault conviction and a consecutive term of two years on the felony-firearm conviction. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.        WAS THE EVIDENCE AT TRIAL INSUFFICIENT TO SUPPORT DEFENDANT'S CONVICTIONS FOR ASSAULT WITH INTENT TO ROB [WHILE] ARMED AND FELONY FIREARM?

II.       DID THE TRIAL COURT ABUSE ITS DISCRETION IN ALLOWING THE TESTIMONY OF OFFICER ANTHONY MENCOTTI WHEN SUCH TESTIMONY WAS IN VIOLATION OF A DISCOVERY ORDER OF THE COURT?

III.      DID THE TRIAL COURT FAIL TO RESPOND TO DEFENDANT'S OBJECTION THAT CERTAIN INFORMATION CONTAINED IN THE PRESENTENCE REPORT WAS INACCURATE, REQUIRING THAT

THIS MATTER BE REMANDED TO THE TRIAL COURT FOR
RESENTENCING AND A NEW REPORT SENT TO THE DEPARTMENT
OF CORRECTIONS?

(Br. in Supp. of Pet., docket #1-1, Page ID#20.)  Respondent has filed an answer to the petition

(docket #6) stating that the grounds should be denied because they are noncognizable state law

claims which have no merit.  Upon review and applying the AEDPA standards, I find that Ground I

of the petition is without merit and the remaining two grounds are not cognizable on habeas review.

Accordingly, I recommend that the petition be denied.

## Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from an attempted robbery and non-fatal shooting on July

12, 2004.  Petitioner was charged with one count each of assault with intent to murder, assault with

intent to rob while armed, first-degree home invasion, assault with a dangerous weapon (felonious

assault), and felony firearm.  Following a preliminary examination on April 11, 2007, Petitioner was

bound over on all five charges.  Petitioner waived a jury and was tried before a judge, beginning on

August 7, 2007 and concluding on August 9, 2007.

In 2004, Yasser Kalkas was the co-owner of the Pizza Place carry-out restaurant on

Ford Road in Detroit.  The business was started in 1989, and it had 35 employees by the time of the

incident.  (Tr. I at 58-60.)  Weekly receipts ranged from $35,000.00 to $40,000.00.  (*Id.* at 61.)

Kalkas purchased a $1,000,000.00 home at 7 Cabri Lane in Dearborn Heights in 2001, and he drove

a Hummer, a Corvette, and a Harley-Davidson motorcycle.  He also dressed expensively and wore

valuable watches.  (*Id.* at 61-63.)

Kalkas met Alef Hamad when Hamad began to work for Kalkas.  They became good friends, and Hamad had visited Kalkas at his home.  (*Id.* at 63-65.)  Kalkas had an ADT alarm system on the home, which could only be turned off by walking to the garage door.  (*Id.* at 65.) Hamad was with Kalkas on several occasions when Kalkas talked to Nassar Hamadi, Kalkas' partner in business, who lived across the street from Kalkas.  Under the partnership arrangement, either Kalkas or Hamadi would take home the day's receipts.  On July 11, 2004, Hamadi was on vacation in Lebanon.  (*Id.* at 66-67.)  Although the employees were not informed, during the week Hamadi was gone, Hamadi's brother picked up the money in the till once each day, and Kalkas took the remainder home at night.  (*Id.* at 68.)  Kalkas put the money in a safe in his home.  (*Id.*)  On July 11, 2004, Kalkas had over $30,000.00 at home.

On the evening of July 11, 2004, Kalkas left work at 10:00 p.m.  Alef Hamad had worked that night, but he had clocked out at 9:00 p.m.  Hamad was still outside when Kalkas left, and Hamad asked Kalkas to go out to dinner with him.  The two left together and went to the Al-Amer restaurant on Warren and Miller.  After dinner, Kalkas dropped Hamad back at Pizza Place. Hamad drove a white Windstar van owned by his other employer.  (*Id.* at 69-70.)  Kalkas then drove to his home, which was located in a gated, private neighborhood, although the gate was broken.  (*Id.* at 72.)  After parking his Hummer in the driveway, Kalkas walked up to the door of his house and unlocked it.  Kalkas had walked five or six steps into the house and had pushed the door to close it, but a man came in right behind him.  The man placed a gun to Kalkas' head and ordered him to "[g]et the fuck down."  *(Id.* at 74.)  Kalkas turned to punch the man, but he was shot in the right upper arm.  (*Id.* at 75, 78.)  The man, who sounded Arabic, was about 6' 1" or 6' 2" tall, and he wore a mask and carried a gun.  (*Id.* at 76-77.)  Kalkas pushed the man out of his way and ran through the

front door and toward the street.  (*Id.* at 79-80.)  After running about ten feet, Kalkas was shot in the

right cheek of his buttocks, and the bullet passed through his stomach and out his right leg.  The shot

caused Kalkas to fall down.  (*Id.* at 80-82.)  Kalkas did not see who shot him.  A neighbor came

from across the street, and the police and an ambulance arrived shortly thereafter.  Kalkas was taken

to Garden City Hospital, where he went in and out of consciousness.  The doctors stated that he

needed surgery or he was going to die.  (*Id.* at 82.)  Kalkas underwent surgery that day, including

being given a colostomy, and he spent ten days in the hospital.  Since that time, he has had five

additional surgeries, and he has had the colostomy reversed.  When he returned home from the

hospital, Kalkas noticed a hole in his den wall.  (*Id.* at 84.)  Kalkas never saw Petitioner before the

preliminary examination.  (*Id.* at 85-86.)  He only saw one masked person on the night of the

incident.  (*Id.* at 87.)  Kalkas indicated that he threw his keys to the side when he was running out

of the house.  (*Id.* at 85.)  He also identified his separate Hummer key.  (*Id.*)

         Dearborn Heights Police Department Sergeant Rory McManmon served as the

evidence technician responding to the crime scene.  (*Id.* at 27-28.)  During the two to three hours

at the scene, he took photographs of the scene and blood stains and gathered evidence, all of which

were introduced into evidence at trial.  (*Id.* at 29-.)  McManmon identified a Jeep key fob, and

pictures of the key fob, which was collected from the yard of Kalkas' house, just next to the

chimney.  (*Id.* at 35, 45.)   A yellow key fob was found just west of the stairs leading to the front

door.  (*Id.* at 37.)  McManmon photographed another set of keys on a Hummer key ring, located

right next to the entrance, just outside the door.  (*Id.* at 38.)  Just behind the door were a blue duffel

bag and a spent cartridge casing.  (*Id.* at 40-41, 46.)  McManmon also photographed a bullet hole

in the French door to the den and a bullet hole in the wall of the den, which was the room to the right

of the front door.  (*Id.* at 42-43.)  No bullet was recovered from the wall, despite officers' digging into the drywall.  (*Id.* at 44.)  Officers recovered a nylon mask at the northwest corner of Evangeline and Cherry Hill.  (*Id.* at 48.)  They recovered a glove and a cd at the end of the driveway of 441 North Evangeline.  (*Id.* at 50.)  The cd was found on the step.  (*Id.* at 53.)

Dearborn Heights Police Detective James Serwatowski testified that he was the officer in charge of the investigation.  By the time Serwatowski arrived at 7 Cabri Lane shortly before 1:00 a.m., other officers were there and collecting evidence.  Serwatowski talked to the officers and made observations of the scene.  He saw a Chrysler key fob in the grass on the west side of the house.  He also noted that the bushes and wood chips nearby had been significantly disturbed. (*Id.* at 89-90.)  Serwatowski was informed that a canine unit tracked the intruders from the house, and that it found a stocking-mask.  (*Id.* at 91.)  Serwatowski returned to the house with Captain Gary Tomkiewicz in the morning, in order to conduct a daylight search.  Serwatowski found a fired bullet lying under Kalkas' Hummer, which was parked in the driveway.  (*Id.* at 92.)  He photographed the bullet and then collected it into evidence.  (*Id.* at 93.)

According to Serwatowski, the glove contained DNA, but it was insufficient for testing.  About nine months later, Serwatowski received a report from the Michigan State Police that they had been able to extract DNA from the mask as well.  (*Id.* at 95-96.)  The DNA was entered into the CODIS system, which is a DNA index database. On April 22, 2005, Serwatowski received a notice that the DNA was a match for that of James Gulley.  Serwatowski was required to obtain another buccal swab from Gulley, in order to confirm the match. Gulley was being housed at the Oakland County Jail on a domestic violence charge.  (*Id.* at 96.)  After obtaining the buccal swab,

Serwatowski sent it to the Michigan State Police for analysis.  The results confirmed the match.  (*Id.* at 97-98.)

In August 2005, Serwatowski learned from Lt. Jeff Sapinko of the Dearborn Heights Police Department that Petitioner had relayed information about the case to a City of Dearborn police officer.   Serwatowski attempted to contact Petitioner, and Petitioner finally called Serwatowski on December 28, 2005.  (*Id.* at 98, 108.)  Serwatowski interviewed Petitioner on December 30, 2005.  Petitioner was not in custody at the time.  After the interview, Petitioner left the Dearborn Police Department offices.  (*Id.* at 99.)  Petitioner wrote and signed his statement, without coercion.  (*Id.* at 100.)  Serwatowski read the statement into the record:

> Summer of '04, can't remember the exact time, I smoked a blunt with Khalid Jihad and some black guy at his, Kalid's house.  They were getting ready to hit a lick, comma robbery.  They don't want me to be involved.  They left.  Shortly after I left separately.
>
> Couple hours later they returned.  I went back to the house on Pinehurst, smoked with Jihad.  He told me the lick got fucked up and Khalid shot the gun. Khalid came half way through the smoke.  I got full smoke.  Khalid was hiding behind a tall bush.  Jigga, Jihad was in a bush, as well as a black guy was on the side of the house.  Khalid pulled out a gun, P88 – on the guy, parenthesis pizza owner when he came home; asked for the money.  Guy backed.  He reached for the gun. Khalid shot him in the hand.  The guy ran.  Khalid shot him in the ass.  We all ran back to the car.  I came home.  I know the gun that was used was a P88 and belongs to Kalid's father.  The gun is kept on Pinehurst.

(*Id.* at 101-02.)   Serwatowski testified that Petitioner had explained why he was giving the statement.  Petitioner reported that he had taken a beating in Dearborn, and he was at the police building to talk about the beating on the day he mentioned the attempted robbery to the detective. Petitioner explained that the beating occurred after Khalid Jaber and Jihad Jaber told another person that Petitioner had stolen the gun used in the attempted robbery.  The person they told, together with several other men, abducted Petitioner and beat him badly, putting him in the hospital.  Petitioner

- 6 -

explained that Khalil and Jigga (Jihad) Jaber were no longer his friends, and he wanted to turn them in for their crime.  Petitioner denied being present at the scene of the home invasion, and he stated that he had gotten the information from Khalil and Jigga.  (*Id.* at 102-03.)  Serwatowski challenged Petitioner's statement, indicating that it was not consistent with what he had heard from Officer Conrad, who was repeating the statement of another officer.  Petitioner stated that the officer was lying, as cops usually do to make things sound better.  (*Id.* at 104-05.)  Serwatowski made arrangements to meet with Petitioner again within ten days, but the meeting never took place.  (*Id.* at 105.)

       In January of 2006, the Wayne County prosecutor issued a warrant against James Gulley.  Gulley reached a plea agreement in November 2006, and he promised to testify. Serwatowski then spoke with Gulley.  Gulley entered his guilty plea in January 2007.  (*Id.* at 105-06.) On cross-examination, Serwatowski acknowledged that he relied on Petitioner's December 30, 2005, statement in obtaining a search warrant for the Pinehurst Dearborn location.  (*Id.* at 11-112.) He also acknowledged that, during his interview with Petitioner, Serwatowski showed Petitioner photographs of various men.  Petitioner could not positively identify Gulley, but indicated that Gulley looked familiar.  (*Id.* at 110.)   Petitioner's statement was given nearly a year before Gulley reached a plea agreement.  (*Id.* at 113.)   Serwatowski's December 30, 2005, supplemental investigator's report indicated that Petitioner had given Serwatowski the Pinehurst address.  (*Id.* at 115.) At the time Petitioner gave Serwatowski the information, Petitioner was not charged with any crime and was not under arrest, and his information was not given in exchange for a plea deal.  In addition, Petitioner offered to testify against both of the Jabers and an unknown black male.  (*Id.*) Further, as to any contradiction in Serwatowski's prior understanding and Petitioner's statement,

- 7 -

Serwatowski acknowledged that he only received a third-hand verbal statement from Sapinko; he had no writing or notes, only Petitioner's name.  (*Id.* at 117.)

On the morning of the second day of trial, defense counsel moved to exclude any statement that Dearborn Police Officers Conrad and Mencotti allegedly took from Petitioner. Counsel argued that she had filed a formal motion and demand for discovery including "any interview, statements of any of the defendants and witnesses which would include Brandon Bazzi." (Tr. II at 4.)  Because she had a particular concern that nothing had been turned over, counsel mentioned at a hearing on May 25, 2007, that her client was interviewed by not only Dearborn Heights Police Officers, but also Dearborn Police Officers.  She wanted to know if there was anything out there, including any audio or videotapes.  Nothing was turned over.  Nevertheless, on the day of trial, she found out that officer Mencotti had made notes on an envelope in August 2005. However, the envelope could not be located because it was not given to the investigating officer or recorded in a police report.  Now, defense counsel was presented with two pages of manufactured notes created two years after the fact.  (*Id.* at 5-6.)

The court indicated that it would not allow the manufactured notes, or the officer's present recollection of the notes that were on the envelope, because they were hearsay.  (*Id.* at 7.) Only the officer's testimony was in issue.  The prosecutor argued that Serwatowski created a report at the time he learned that it summarized what he believed Petitioner had told Officers Mencotti and Conrad.  He therefore contended defense counsel was aware of the story at that time.  (*Id.* at 8-9.) The prosecutor claimed that he had only had the opportunity to talk to Sergeant Mencotti on the Saturday before trial.  Mencotti gave the prosecutor a copy of the seat-belt traffic ticket issued to Petitioner on the day Mencotti spoke with Petitioner.  Mencotti told the prosecutor that only he had

- 8 -

been present at the interview with Petitioner.  (*Id.* at 10.)  Officer Mencotti indicated that he thought he had notes on an envelope at home.  When he went home to look, however, he could not find it. Mencotti sat down over the weekend and wrote out notes about the remembered conversation two years before, and the notes were given to defense counsel on Monday, the start of trial.  (*Id.* at 10-11.)

Defense counsel responded that the order requiring that notes be turned over was issued on May 25, 2007.  She argued that it was ridiculous for the prosecutor to wait until the weekend before trial to inquire if there were any notes, only to discover they could not be found. (*Id.* at 12.)  The court determined that it would allow Officer Mencotti to testify before issuing a decision on the motion.  (*Id.* at 13.)

Sergeant Anthony Mencotti testified that he had been a Dearborn police officer for 24 years.  (*Id.* at 14.)  He testified that he had known Petitioner since Petitioner was 14 or 15 years old.  On August 8, 2005, Mencotti was working a traffic shift in a marked car.  He saw a gray Lincoln proceed northbound on Wyoming Street near Warren Avenue, traveling over 50 miles per hour.  Mencotti turned and followed the vehicle, which pulled into a shopping area on Wyoming, just north of Warren.  When Mencotti pulled up, he saw it was Petitioner, who was not wearing a seat belt.  (*Id.* at 17-18.)  As he approached the car, Mencotti smelled marijuana.  Mencotti asked Petitioner what he had in the car, and Petitioner stated that he had just smoked a blunt.  Mencotti asked again, and Petitioner indicated that he had a "dime bag."  (*Id.* at 18-19.)  Mencotti ordered Petitioner out of the car and cuffed him, placing him in the police cruiser.  Defendant said, "Mencotti, take it easy.  Give me a break . . . . Don't arrest me.  Don't tow the car. . . . I got information for you."  (*Id.* at 19.)  After Petitioner offered information, Mencotti took Petitioner to

a secluded area near some warehouses at 8747 Brandt, where no one was likely to see them talking. Plaintiff gave Mencotti information, and Mencotti claims to have taken notes on a large manilla envelope.  After about a half hour or 45 minutes, Mencotti issued Petitioner a safety-belt ticket.  He also issued a fictitious ticket for violation of the public health code, so that Petitioner could demonstrate to others that he had received a penalty, which would prevent others from thinking that he had snitched to the police.  (*Id.* at 22-23.)  Mencotti did not write a police report on the incident, and the interview was not recorded.  (*Id.* at 23-24.)  After he finished his traffic shift, Mencotti reported the incident to then-Corporal Conrad, whom Mencotti supervised, because Conrad knew a detective in the Dearborn Heights Police Department.  (*Id.* at 24, 42.)  Mencotti had no further contact with the case, except to execute the subsequently issued warrant on Khalid Jaber.  (*Id.* at 42-43.)  Mencotti threw the envelope away after about six months.  (*Id.* at 24, 28.)  He never talked to Sergeant Serwatowski about the information he had received from Brandon Bazzi, and he never took his notes from the envelope or created any summary of those notes.  On the weekend before trial, Mencotti first talked to Serwatowski and reconstructed from memory the conversation he had with Petitioner.  (*Id.* at 30.)

Based on Officer Mencotti's failure to issue a report or speak to the investigating officers and his ultimate destruction of his notes, defense counsel renewed her motion to disallow Mencotti's testimony.  The court ruled that the fact that the notes had been taken and subsequently destroyed went to the weight and credibility of Mencotti's evidence, not to its admissibility.  (*Id.* at 33-35.)

Officer Mencotti continued to testify, saying that Petitioner told him that he had information on a shooting that had occurred almost a year earlier, in which a pizza guy had gotten

shot when he came home.  Petitioner told Mencotti that he knew who had committed the crime, indicating that a few men were involved.  (*Id.* at 37.)  Petitioner indicated that, before the shooting, he had been getting high with Khalid and Jihad Jaber and another Arabic man, Atef.  He stated that Atef worked for the pizza guy and knew that the man had a large sum of money at his house, because he was going to buy a business.  Atef told the others that it would be easy to do a robbery. (*Id.*)  Officer Mencotti stated that he was familiar with the Jabers, but not with Atef.  (*Id.* at 38.) Petitioner told Mencotti that he had wanted to be involved, but the others told him no.  On the day of the robbery, Petitioner was driving around in Khalid's Explorer, getting high.  The other men in the car were Khalid, Jihad and an "Abad," which means a black man.  (*Id.* at 38-39.)  They went into Dearborn Heights, and they parked on a dark side street.  Petitioner stated that he never got out of the car, but Khalid, Jihad and the black man left the vehicle.  The black man was carrying a semi-automatic handgun.  When the men left the vehicle, Petitioner smoked another blunt.  Awhile later, the men came running back.  According to Petitioner, Jihad and the black man were nervous and yelling.  Khalid was kind of laughing and said that the pizza guy had gone for the gun and that he shot him in the head and the hand or the head and the ass.  Khalid stated, "I think I killed a guy." (*Id.* at 40.)  Petitioner told Mencotti that Khalid was a "straight up gangster," and Petitioner was afraid of him.  (*Id.*)    Petitioner told Mencotti that, if the information got out, the men would kill Petitioner.  (*Id.*)  Mencotti then wrote a fictitious ticket for violating the health code and a genuine ticket for not wearing a seat belt.  Petitioner walked back to his car, because he did not want to be seen with Mencotti.  (*Id.* at 41.)

James Gulley testified pursuant to a plea agreement under which he pleaded guilty to assault with intent to rob while armed and felony firearm.  In exchange, he received a prison

sentence of five to fifteen years on the attempted-robbery conviction and a two-year sentence on the felony-firearm conviction.  The remaining charges – assault with intent to murder, assault with intent to rob while armed, home invasion, felonious assault, and being a felon in possession of a firearm – were dismissed.  Under the plea agreement, Gulley agreed to testify against Khalid Jaber, Jihad Jaber, Atef Hamad, and Petitioner.  (*Id.* at 46-47.)  Gulley claimed that he met Petitioner through Khalid Jaber shortly before the incident, at a gas station located at the intersection of Warren Avenue and Southfield Road, where  Gulley was accustomed to buying marijuana from Khalid Jaber.  (*Id.* at 48-50.)  Khalid knew Gulley as "G."  (*Id.* at 51.)  Through Khalid, Gulley had also met Jihad Jaber, whom he knew as "Jigga."  (*Id.* at 52.)  Gulley also identified "Atef," whom he met through Khalid.  (*Id.* at 54.)  In early July 2004, while Gulley, Khalid, Jihad, Atef, and Petitioner were all in a white Windstar van, Atef brought up the idea of robbing Mr. Kalkas.  (*Id.* at 54-55.)  Atef indicated that the robbery needed to happen before "Kalkas' people" got back from Lebanon, because the money usually was kept at those people's home across the street from Kalkas.  (*Id.* at 56.)  Atef indicated that Kalkas had a large sum of money because he was planning to buy a bar.  Gulley testified that he could not understand everything that was said, because part of the conversation was in Arabic.  (*Id.* at 56-57.)  Khalid, Jihad, Gulley and Petitioner drove out to where Kalkas lived later that day, in Khalid's Explorer.  (*Id.* at 57-58.)  According to Gulley, Petitioner was sitting in the back seat, on the passenger side of the vehicle.  (*Id.* at 59.)

In the late night hours of July 11, 2004, and into the early morning of July 12, 2004, Gulley got into the same Explorer at the Warren-Southfield gas station, joining Khalid, Jihad, and Petitioner.  (*Id.* at 60.)  They knew that the people who were in Lebanon were scheduled to return on July 12, 2004.  (*Id.*)  Khalid received a call from Atef, who told them that Kalkas would be home

in six minutes.  (*Id.* at 61.)  Gulley testified that he had a .44 caliber revolver with him and that

Petitioner had a .380 or nine millimeter semi-automatic pistol.  (*Id.* at 61-62.)  Gulley saw the

weapon while the two were in the bushes near the house.  (*Id.* at 62.)  Jihad Jaber went into a house

on a street off Warren Avenue and picked up two guns.  (*Id.* at 63.)  Khalid bought nylon stockings

at the gas station, which they used as masks.  (*Id.* at 63-64.)  Petitioner wore one of the stocking-

masks.  (*Id.* at 64.)  Before the robbery, they drove around smoking marijuana.  They parked the

Explorer in the driveway at 441 Evangeline, which was directly behind Kalkas' house.  (*Id.* at 65,

79.)  Jihad stayed in the back of the house.  Gulley and Petitioner were in the bushes on the side of

the house, and Khalid was in front of the house.  (*Id.* at 65.)  The plan was to hit Kalkas "upside the

head and take the money from him."  (*Id.* at 66.)  They waited four or five minutes before the

Hummer pulled into the driveway.  Kalkas opened the door, and Khalid jumped out.  Gulley and

Petitioner started toward the house.  (*Id.* at 66.)  They heard a gunshot, however, and they ran back

to the vehicle.  (*Id.* at 66.)  No one was supposed to shoot.  (*Id.* at 66-67.)  According to Gulley, they

heard no more shots, because they were already in the vehicle.  Jihad had run back to the Explorer

with Gulley and Petitioner, and Khalid came a couple of minutes later.  (*Id.* at 67.)  Khalid was

laughing and told them that Kalkas had grabbed the gun, causing it to go off.  (*Id.* at 66, 68.)  Khalid

told the others that "he shot [Kalkas] in the ass."  (*Id.* at 68.)  All of the others kept asking, "[W]hy

the hell did you shoot him[?]"  (*Id.* at 68.)

They drove away without the car lights on.  They noticed some people coming from

the home across the street.  (*Id.*)  A couple of blocks later, Gulley threw his mask out the window,

and Petitioner did the same, moments later.  (*Id.* at 69.)  As far as Gulley knew, no one got any

money out of the incident.  (*Id.*)  When they dropped Gulley off at the same gas station, all three of

the others remained in the vehicle.  (*Id.* at 70.)  Gulley dropped the key to the Jeep belonging to his child's mother.  (*Id.* at 73.)

Gulley was cross-examined on discrepancies in his testimony and his prior statements to police and at the preliminary examination.  (*Id.* at 81-93.)  He also testified that he had been charged with seven felony offenses and had been charged as a third habitual offender.  (*Id.* at 93-94.)  The penalties he faced for his offenses included two possible life sentences and other sentences that were double the base statutory maximums because of the third-habitual-offender charge.  (*Id.* at 94-95.)  His plea agreement promised him a prison term of five to fifteen years for assault with intent to rob while armed, the minimum term allowable on the possible life offense.  (*Id.* at 98.)  Gulley also acknowledged that he had provided eight different aliases and five different birth dates during the course of his interactions with police, in order to hide his identity.  (*Id.* at 100-02.)

Dearborn Police Patrol Sergeant Richard Conrad testified that he was a corporal under the supervision of Sergeant Mencotti on August 8, 2005.  (*Id.* at 107-08.)  On that date, Conrad had was vaguely aware that the Dearborn Heights Police Department had a case involving the crime at 7 Capri Lane.  When Mencotti told him about the incident, Conrad called Dearborn Heights Sergeant Jeff Sapinko and relayed the information.  (*Id.* at 108.)  Conrad spoke briefly to Serwatowski a couple of months after the initial report.  (*Id.* at 109.)  Mencotti never showed Conrad any notes of his conversation with Petitioner.  (*Id.* at 110.)

Adam Abboud, 15, testified that he had lived at 440 Evangeline in Dearborn Heights for seven years.  (*Id.* at 112.)  On July 11, 2004, Abboud was at home.  While in his driveway with his cousin and his brother, he saw a white Explorer drive down his dead-end road three or four times.  Once, it backed up in his driveway and turned around.  (*Id.* at 115-16.)  He could not see the

- 14 -

occupants through the tinted windows, but the two windows facing him were rolled down while the car was turning around.  He saw one man, whom he thought looked Arabic.  (*Id.* at 117.)  Abboud and his family went to his aunt's house that evening.  (*Id.* at 118.)  When they got home, as he was getting out of the car, he heard and then saw the white Explorer flying down the street and then turn at Cherry Hill.  (*Id.* at 119-20.)  Abboud went to bed.  He later learned that something had happened on Cabri Lane.  (*Id.* at 120-21.)  Abboud acknowledged that 441 Evangeline was directly across the street from his house, but he did not see the car back out of the driveway at 441; he did not hear or see the car until it was halfway down the street toward Cherry Hill.  (*Id.* at 122-23.)

The parties stipulated that the DNA expert, Tara Reinholz, found Gulley's DNA on the stocking mask.  They also stipulated that Sergeant Rayer, the firearms expert, could not match the firearm taken from the Jabers' home with the casing found at the scene and the bullet recovered from the victim.  (*Id.* at 123-24; Tr. III at 4-5.)

The prosecution rested, and the court denied the defense motion for a directed verdict.  (Tr. III at 6, 12.)  Petitioner elected not to testify, and the defense put on no witnesses.  (*Id.* at 13.)

Outlining its factual findings in detail, the court found Petitioner guilty, as an aider and abettor, of assault with intent to rob while armed and felony firearm.  (*Id.* at 46-48.)  The court found Petitioner not guilty of the remaining charges of assault with intent to murder, first-degree home invasion and felonious assault.  (*Id.* at 48-49.)

On August 30, 2007, the court exercised leniency under the guidelines and sentenced Petitioner to the same sentence as Mr. Gulley had received:  five to fifteen years on the conviction for assault with intent to rob while armed and two consecutive years on the felony-firearm conviction.  (Sentencing Tr. at 17, docket #18.)

B.      **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on October 29, 2007, raised the same three issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #11.)  By unpublished opinion issued on January 22, 2009, the Michigan Court of Appeals affirmed Petitioner's convictions and sentences.  (*See* 1/22/09 Mich. Ct. App. Opinion (MCOA Op.), docket #11.)  The court, however, remanded the case to the trial court, to make a finding on whether the disputed information had an effect on the sentence imposed.  If so, the trial court was directed to resentence Petitioner.  If not, the trial court was instructed to strike the disputed information and send a corrected PSIR to the Michigan Department of Corrections.  (MCOA Op. at 6.)  On February 23, 2009, the trial court found that it had not relied on the disputed information, and it therefore denied resentencing.

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims presented to and rejected by the Michigan Court of Appeals.  By order entered on October 26, 2009, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Order, docket #12.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v, Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  The court may grant relief under the "unreasonable

application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

      Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 131 S. Ct. at 785 (noting that the presumption that the state-court's

decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.    Sufficiency of the Evidence

In his first ground for habeas relief, Petitioner asserts that the prosecutor presented insufficient evidence to support the conviction of assault with intent to rob while armed and felony firearm. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506

U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

       The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id*.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

       With respect to his conviction for attempt to rob while armed, Petitioner argues that no DNA evidence linked him to the crime and the only eyewitness testimony was that of James Gulley.  Petitioner contends that Mr. Gulley's testimony, which first implicated Petitioner in the offense, was inconsistent, was provided in exchange for a plea deal that allowed him to reduce his sentence from a potential life sentence to one in which he served only five to fifteen years, and was made only after Gulley's attorney had been provided with evidence that Petitioner had made an earlier statement implicating Gulley and the other accomplices.   In contrast, Petitioner argues, he himself gave a voluntary statement to the police approximately a year before Gulley pleaded guilty to his offenses, at a time in which he was not charged with any crime.  Further, Petitioner argues that Sergeant Mencotti's testimony that Petitioner had given a somewhat different statement to Mencotti

two years earlier was wholly incredible, given that Mencotti had thrown away his personal notes one and one-half years before trial, had never transcribed those notes to an official record, had never spoken to the investigating officer, and had never even discussed the case (which belonged to a different police department) until the weekend before trial.

The Michigan Court of Appeals recited a detailed summary of the evidence and found the evidence sufficient to support Petitioner's convictions.  (*See* MCOA Op. at 1-3.).

Petitioner was convicted as an aider and abettor in the offense of assault with intent to rob while armed.  "The elements of assault with intent to rob while armed are:  (1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being armed.  Because this is a specific-intent crime, there must be evidence that the defendant intended to rob or steal." *People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991) (internal citation omitted); *see also People v. Gibbs*, 830 N.W.2d 821, 830 (Mich. Ct. App. 2013).  "To establish aiding and abetting, a prosecutor must show that: (1) the charged crime was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement which assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave the aid and encouragement." (MCOA Op. at 4 (citing *People v. Robinson*, 715 N.W.2d 44, 47-48 (Mich. 2006)).)

Although there were substantial credibility issues with respect to both Gulley and Mencotti's testimony, credibility determinations are for the trier of fact, not this Court.  The trial court carefully analyzed the evidence on the record and indicated that he fully appreciated the credibility issues and carefully set forth his specific findings.  (*See* Tr. III at 40-49.)  Both Gulley and Mencotti testified to facts that, if believed, would have supported a finding that Petitioner was

in the vehicle when the other defendants cased the home, was in the vehicle when two weapons were picked up, was present at the robbery, was carrying a 9 millimeter pistol, abetted others in the possession of various firearms, and was running toward the house to assist in the robbery when the shot was fired.  Gulley's testimony was specific about what Petitioner was wearing and doing.  In addition, according to Petitioner's own statement, he wanted to be part of the robbery from the time it was first discussed.  Further, although Petitioner was not under arrest or charged in any crime at the time he made his statement to Sergeant Serwatowski, he made his initial statement to Sergeant Mencotti in order to avoid being arrested for carrying marijuana and to avoid having his vehicle towed.  Moreover, by his own admission, Petitioner gave his statement to Serwatowski because he had just been seriously beaten and believed the Jabers were responsible for that beating.  Finally, though the court found the evidence sufficient to convict Petitioner of two offenses, it dismissed the most serious charges against Petitioner.  Under these circumstances, and in light of the deference owed to the trier of fact and the state courts, *see Davis*, 658 F.3d at 531, the evidence was entirely sufficient to support Petitioner's conviction for assault with intent to rob while armed.

Petitioner's challenge to the evidentiary support for the felony-firearm conviction is similarly without merit.  The elements of felony firearm "are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony.  One must carry or possess the firearm when committing or attempting to commit a felony.  Possession of a firearm can be actual or constructive, joint or exclusive." *People v. Johnson*, 293 Mich. App. 79, 82–83; 808 N.W.2d 815 (2011) (footnotes omitted).  A person also may be found guilty of felony firearm by aiding and abetting.  "All that is required to prove aiding and abetting felony-firearm is that the defendant aided

and abetted another in carrying or having in his possession a firearm while that other commits or attempts to commit a felony." *People v. Moore*, 679 N.W.2d 41, 47 (Mich. 2004).

As already discussed, the prosecutor presented sufficient evidence to convict Petitioner of the felony of attempting to rob while armed. In addition, in evaluating the evidence supporting that conviction, the Court already has concluded that sufficient evidence existed to prove that Petitioner possessed a firearm and aided and abetted the other defendants in possessing other firearms. For the same reasons, the evidence was sufficient to support his conviction for felony firearm.

II.   Violation of Discovery Order

In his second ground for habeas relief, Petitioner contends that the trial court abused its discretion when it concluded that the prosecutor had not violated the discovery order in failing to locate and disclose Sergeant Mencotti's notes. He argues that, in light of the failure to disclose the existence of Sergeant Mencotti's notes, Mencotti should not have been allowed to testify about his memory of the conversation.

To the extent that Petitioner argues that the trial court erred under Michigan law in concluding that the prosecutor violated the discovery order, the issue is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.

- 23 -

Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (internal quotations omitted)); *accord Estelle*, 502 U.S. at 70 (citing *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) (holding that evidentiary decisions do not violate due process unless they cause the trial to be fundamentally unfair); *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

In the state courts, as here, Petitioner did not argue that the admission of Mencotti's testimony violated a constitutional right, though he quoted *People v. Florinchi*, 269 N.W.2d 500 (Mich. Ct. App. 1978), which included a brief reference to *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Supreme Court held that "the suppression by the prosecutor of evidence favorable to an accused is a violation of due process." *Florinchi*, 269 N.W.2d at 503. Despite the fact that Petitioner did not squarely argue the constitutional issue, the Michigan Court of Appeals considered whether Petitioner's constitutional rights had been violated.

- 24 -

In reviewing the constitutionality of the prosecutor's failure to disclose Mencotti's notes, the court of appeals recognized that "'[t]here is no general constitutional right to discovery in a criminal case.'"  (MCOA Op. at 5 (citing *People v Stanaway*, 521 N.W.2d 557, 568 (Mich. 1994) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).)  The Michigan Court of Appeals also recognized that Petitioner did not demonstrate that Mencotti's notes would have been favorable to him or exculpatory within the meaning of *United States v. Bagley,* 473 U.S. 667, 675 (1985), or *Brady*, 373 U.S. at 87.  (*See* MCOA Op. at 5 (citing *People v. Elston*, 614 N.W.2d 595, 602 n.6 (Mich. 2000)).)

In addition, Petitioner fails to demonstrate that the admission of Mencotti's testimony caused his trial to be fundamentally unfair.  *See Estelle*, 502 U.S. at 70.  Defense counsel fully cross-examined Mencotti, challenging his credibility  on the substance of the testimony and on his decision to dispose of the notes, given the lack of any police report or written record.  Counsel also highlighted the lack of reliability in her closing argument.  For both reasons, Petitioner received ample opportunity to challenge Mencotti's claims.

Moreover, because Petitioner had the opportunity to cross-examine Mencotti, he has no basis for claiming that he was deprived of his right to confront Mencotti on the substance of any notes.  *Id.*; *see also United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) (holding that the right to confrontation secures an adequate opportunity to cross-examine adverse witnesses)); *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)); *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).

Finally, Petitioner made no showing that the prosecutor committed misconduct by intentionally destroying Mencotti's notes or having them destroyed. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that, for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Mencotti did not work in the same police department as Serwatowski, was completely uninvolved with the investigation of the case, and never spoke with Serwatowski until the weekend before trial. He therefore cannot demonstrate that Serwatowski committed any improper conduct, much less conduct that violated Petitioner of a fair trial.

In sum, Petitioner fails to establish that the trial court's evidentiary decision violated any federal constitutional right, much less that the state-court decision was either contrary to or an unreasonable application of established Supreme Court precedent. He therefore is not entitled to relief on his second habeas ground.

III. <u>Presentence Report</u>

Petitioner argues that he is entitled to resentencing, because the trial court failed to respond to either of Petitioner's objections to the Presentence Investigation Report (PSIR). First, he claims that he objected to the language in the PSIR that indicated that he was unhappy with his lawyer, that he had been promised a not-guilty verdict, and that his lawyer prevented him from presenting witnesses at trial. Petitioner claims that he made no such statements, and he asked that the statement be stricken. Second, Petitioner argues that he objected to the statement in the PSIR that he had attended Michigan State University. Petitioner expressly advised the court that the

information was incorrect and that it should be stricken.  In response, the court made no findings or corrections and merely responded, "All right."  (MCOA Op. at 6.)  Petitioner claims that he is entitled to resentencing and to having a new PSIR sent to the Michigan Department of Corrections.

In evaluating Petitioner's claim, the Michigan Court of Appeals found that the trial court had erred when, after failing to explicitly resolve Petitioner's objections to the PSIR, it failed to indicate whether it had relied on the disputed evidence in setting the sentence.  As a consequence, the court ordered the case remanded to the trial court for a determination as to whether the disputed information was relied on for sentencing.  If the trial court ruled that it had relied on the disputed information, the trial court was directed to resentence Petitioner.  If not, the court of appeals directed the trial court to strike the information from the PSIR and to send an updated PSIR to the Michigan Department of Corrections.  (*Id.*)

According to the docket sheet from the Wayne County Circuit Court, the trial court issued an order on February 23, 2009, holding that it had not relied on the disputed portions of the PSIR in setting the sentence.  (Register of Actions, docket #9 at 3.)  The trial court, however, apparently never sent an updated PSIR to the Michigan Department of Corrections.  Petitioner contends that he should be resentenced and that he is entitled to an updated PSIR.

It is well established that a court violates due process when it imposes a sentence based upon materially false information.  *United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 740 (1948) (citation omitted).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447.

- 27 -

Here, the court of appeals recognized the constitutional standard and remanded the case to the trial court to determine whether it had based its sentencing determination on the allegedly false information.  On remand, the trial court expressly stated that it had not relied on the alleged errors in the PSIR in reaching its sentencing decision.

As previously discussed, a factual finding by the state court is presumed to be correct, and the petitioner has the burden of demonstrating by clear and convincing evidence that the factual determination was erroneous.  *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Petitioner has made no attempt to overcome the statutory presumption.  Petitioner therefore cannot demonstrate the requisite reliance under the second prong of the *Tucker* standard.

Finally, to the extent that Petitioner claims that he is entitled under the decision of the Michigan Court of Appeals to have a corrected PSIR sent to the Michigan Department of Corrections, he fails to raise a claim of constitutional magnitude.  The Supreme Court has never held that prisoners have the right to a PSIR that is accurate in all respects, regardless of whether the errors had any influence on sentencing.  *See Hili v. Sciarrotta*, 140 F.3d 210, 216 (2d Cir. 1998) (holding that "the mere presence of . . . inaccurate information in a [presentence report] does not constitute a denial of due process").  The trial court's failure to fully comply with the court of appeals' order, therefore, raises only a question of state law, which is not cognizable in this proceeding.  *See Rodriguez v. Jones*, 625 F. Supp. 2d 552, 569 (E.D. Mich. 2009).

- 28 -

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  December 23, 2014                          /s/ Phillip J. Green
                                                   Phillip J. Green
                                                   United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Branch*, 537 F,3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).